EDWIN R. PHINNEY v. EDMUND HALL.

*Real-estate agent—Middle-man—Commission.*

A real-estate agent who acts as an intermediary between a land-owner and a prospective purchaser must at least act in good faith, and cannot be allowed to attempt to extort a price from one principal not demanded or required by the other, and then be entitled to a commission as for a service.

Error to Saginaw. (McKnight, J.) Argued June 20, 1894. Decided July 10, 1894.

*Assumpsit.* Defendant brings error. Reversed, and no new trial granted. The facts are stated in the opinion.

*Henry A. Chaney* [1] (*Hatch & Cooley,* of counsel), for appellant.

*Weadock & Purcell,* for plaintiff.

McGRATH, C. J. This suit is brought to recover a commission upon the sale of certain Canada pine lands known as timber limits Nos. 100, 101, 105, and 106. Plaintiff insists that on the 2d of April, 1891, he met defendant, and had the following conversation with him:

"I said I had some Canada timber in my possession I would like to show him, belonging to Pack, Woods & Co., of Cleveland, on which, if he would like to buy it, and if everything was satisfactory, I would get him a refusal. Hall got out a map of the country where it lay, and the tracts in question were numbered on the map, and the names of Pack, Woods & Co. were on them.  *  *  * He asked me how much timber there was on them, and I

---

[1] Mr. Chaney died shortly before the argument of the case, and the remarks of counsel regarding his death will be found at the end of the opinion.

gave him all the information I had from Pack.   *   *   *
Then he wanted to know the price, and I said the price
to them [the holders of prior options] had been $500,000;
that Pack had made two groups of them, one consisting
of berths 100 and 101, into one group called 'Number
One,' and the other of berths 105 and 106, into ' Number
Two,' and the price of each was $250,000, or $500,000 for
the four.    Well, after talking further about it, he finally
said, said he: 'They look well, and lay well in a group;
look well to lumber and well to handle.   Now,' he said,
'I would like to look at them, and if I could get a refusal
at less money'—   'Well, now,' I says, 'I don't know as
we can get any less refusal on them at all.'   And finally
he said, if he could get a refusal of $450,000, he would
go and look at them.   'Well,' I said, 'I don't know as
we can get any refusal for less than half a million dol-
lars.'   However, upon that conversation and talk at that
time, and by his request, I wrote to Mr. Pack.   I said to
Mr. Hall: 'At the price they have been offered,—half a
million dollars,—you will have to pay me $10,000 if you
buy them all; or if you buy one group, or two berths,
you will have to pay me $5,000.'   And he finally said,
says he, 'I suppose you get a commission from Mr. Pack?'
And I said, 'I do.'   And he said: 'Of course, that makes
no difference to me.   If I can buy them, commission and
all, at the price, I am willing to take them.'   And, after
talking some little time further, he requested me to get a
refusal of them four limits at $450,000.   I did take up
the matter with Mr. Pack with reference to getting a
price on those lands.

"I next saw Mr. Hall, on the 8th day of April, at my
office, in this city.   At the Detroit conference, I said to
Mr. Hall: 'Now, Mr. Hall, there is just one commission
to this land.   In case you buy it all, it don't make any
difference what price you buy it at, you have got to give
me $10,000, if you buy it now, or at any time; buy it at
$450,000, or at any price.'   That was the talk that we
had, and he consented to it; and upon that I got the
refusal, or got a letter from Mr. Pack.   On April 8, I
saw Mr. Hall, at my office in this· city.   I telephoned
the invitation to him to see if I couldn't see him.   I
learned he was in the city, and was at Judge Edget's
house to dinner, and I telephoned him there, and made
an agreement to have him call at my office in the post-
office when he came down from dinner, which he did.   I

had a talk with him at that time. I said that I had written Mr. Pack, as he had requested me, the day after I left his office in Detroit; and that I had a letter from Mr. Pack in reference to that, and he authorized me to offer the four limits at $450,000. I think I showed him the letter."

On April 9, 1891, Hall wrote plaintiff as follows:

"The advices we get from Canada seem to show it to be impracticable now to travel over limits, as the streams are all at flood; and I find Mr. Morey had promised to send our men as soon as snow is off to look some other limits. So it is impracticable at present to take an option on the limits we talked with any expectation of looking them promptly. I am greatly obliged for the interest you have manifested in helping me get on the trace of some good limits. If I can see a chance of getting men onto those limits hereafter, if they remain in your hands unsold, I will write or see you personally."

On May 18, 1891, plaintiff wrote defendant as follows:

"The Canada timber limits already talked to you about and made you prices upon are still in the market at the price given you. No one has had the refusal since I talked with you last, and it is now a good time to look at this timber; and if you would like the refusal, and could look at it, I shall be pleased to get the same for you. If you have an idea that you would care to look at it at all, and it is not convenient for you to look at it now, how soon before you will be able to send and have it examined?"

Hall replied May 19 as follows:

"I have four men over in Canada now, and they cannot be expected back before the flies would render it impracticable to stay in the woods. I shall not probably attempt to do anything till after midsummer."

On August 28, 1891, Hall wrote Phinney as follows:

"A man having an option on two of the Pack, Woods & Co. limits you once had for sale wants me to look them with the view of buying. I write to ask advice and information. The limits he claims to represent are 'Hyman' and the one directly north of it, No. 101; these two being

the east of the four limits. Can you tell me if the other two limits are for sale, or could be for sale, if you wanted it? And can you tell me which two are the most desirable to supply my mill? Of course, I should much prefer to deal with you if any of the lands are in your hands. Do you remember what price the lands were held at while in your hands?"

Phinney replied, saying:

"I think Mr. Pack has given some one in Detroit option on berths Nos. 100 and 101 that you refer to; at least, he told me that parties in Detroit wanted the refusal upon them. Berths Nos. 105 and 106 are not in the market,—that is, they are not being offered,—but I think I could get you the refusal upon them in case you want to go at once and look at them. I will write Mr. Pack to-day to know if you can have the refusal upon 105 and 106 or not, also find out if the parties offering you berths Nos. 100 and 101 have the refusal or not, and will write you again. If you will remember, I gave you price upon the four berths at your request, with an offer of an option for you to go and examine them if you so wished, at $450,000; but you replied under date of April 9, 1891, that you had other berths then to look, and could not look at any other until this fall. My information from Mr. Pack about these limits is that there is more timber upon berths 100 and 101 than upon Nos. 105 and 106, but that the timber is much better upon Nos. 105 and 106, but that the timber upon 105 and 106 is not so handy to get out as on Nos. 100 and 101; but my opinion is that you should buy the four berths if you want as much timber, but, if you want 150 to 175 millions, you should buy berths Nos. 105 and 106. All these berths have been in my hands. Can yet get them for you if option has not been given, in case you want to look them at once."

Defendant heard nothing further from plaintiff. October 22, 1891, Hall bought berths No. 100 and 101 from Pack, Woods & Co. for $185,000, and in November, 1892, he bought limits Nos. 105 and 106 for $225,000.

It appears that on March 28, 1891, Pack wrote to Phinney as follows:

"I think it will be fully as well to offer only two of

our timber berths, and not put the others on the market at present. We have decided to reduce the price of berths Nos. 100 and 101 to $210,000, and to withdraw berths 105 and 106. You may offer 100 and 101 at the reduced price to the parties, as you think best."

April 2, 1891, Phinney wrote to Pack recounting his interview with Hall. He says:

"I told him that there was at least without doubt 250,000,000 of timber, and may be more, and the price you had offered the four limits would be only $2.00 stumpage. I did not give him the price that you now name on limits 100 and 101, and said to him that I had been figuring with Merrill & Ring; and that, if you made any better price on these two limits than you had made some time ago, then I should feel as if I was under obligations to offer to Merrill & Ring first, but, in case they should not accept of your figure, I would then give him the refusal. He has looked at several pieces over there, but none has yet suited him. He likes the way these four limits of yours lay, and says that, if he should look at them, he should not care if there was not over 250,000,-000; if the land was worth the price was all he wanted.

"Upon receipt of this letter, if you still decide that you do not want to offer limits 105 and 106 with the other two limits, then you had better telegraph me accordingly, so that question will be settled and decided. By that time I shall have seen Ring & Merrill, and will know if they want to look at limits 100 and 101 at the present price you name. I will then have all the facts before me, and can tell better what it is best to say to either Ring & Merrill or Mr. Hall. He asked me if I did not think you would make him a price on the four limits at $450,-000. He will look at them, and take refusal at that price, *and I think he will go and look at them at even more, as he is plenty able to buy, and is anxious,* as he wants to fetch the timber to his mill at Bay City."

It appears from the written evidence disclosed by this record that at the time of the first interview, at which it is insisted that defendant consented to pay plaintiff from $5,000 to $10,000 for his services in defendant's behalf, plaintiff had been instructed by Pack, Woods & Co. to

sell limits Nos. 100 and 101 at $210,000; yet at that interview plaintiff concealed from defendant that information, and informed him that the price for those limits was $250,-000, or $40,000 more than he had been authorized to sell those limits at. It also appears by a letter written to Phinney by Pack, Woods & Co. on April 21, 1891, that Phinney was again instructed to offer these limits at $210,-000. This information was concealed from defendant. It is no answer to say that the double employment was disclosed. As middle-man, he was not intrusted to fix the terms, but merely to interpret between the principals. Story, Ag. § 31. He was not instructed by the sellers to obtain the best price possible. Whether a broker so instructed could act for both parties, and recover commissions from both, need not be discussed. Here the price was fixed. As his agent, Hall was entitled from plaintiff to all the information which he possessed consistent with his duty to Pack, Woods & Co. His duty to them did not require this concealment. The intermediary must at least act in good faith. He cannot be allowed to attempt to extort a price from one principal not demanded or required by the other, and then be entitled to a commission as for a service.

Upon the undisputed testimony, plaintiff is not entitled to recover, and the judgment is reversed, with costs of both courts, and no new trial granted.

Long, Grant, and Hooker, JJ., concurred. Montgomery, J., did not sit.

---

REMARKS OF COUNSEL REGARDING THE DEATH OF HENRY A. CHANEY.

By Mr. Hatch, of counsel for the defendant:

"Before closing my argument I wish to speak of a solemn occurrence connected with the case.

"Mr. Henry A. Chaney was attorney of record for the defendant. He prepared the case on the part of the defendant, appeared and took an active part on the trial in the court below, settled the

bill of exceptions, and prepared the brief to which his name is attached, and which has now been submitted to the Court. He expected to be present, and participate in the presentation of the case here. But he is dead. He died suddenly, on the 7th of June, at his home in Detroit.

" He has, for many years, been an active member of the bar, particularly in that department connected with the literature of the law. For his labors in connection with the many volumes of reports of the decisions of this Court, and in the preparation and editing of digests, and for his labors in connection with legal literature generally, the bar of the State owes to him a great debt of gratitude.

" Mr. Chaney was a man of wide culture, of fine literary attainments, a genial, warm-hearted friend, and a most courteous gentleman. We who had the pleasure of his acquaintance will not soon forget, but will long remember, the many excellent qualities of our departed brother.

" The brief which he prepared for submission in this cause was perhaps one of the last which he ever wrote. Its nervous energy attests his power in presenting an argument. The fact that he is not here to-day to address the Court—his untimely and unexpected death—adds a melancholy interest to the case."

By Mr. Weadock, of counsel for plaintiff:

"*May it please the Court:*

" I want but another moment to say a word, in which I desire to join Mr. Hatch in his deserved tribute of respect to the memory of the late Mr. Chaney. His sad and sudden death is greatly to be deplored, and, while a sudden death lessens the duration of pain of the afflicted, it intensifies the shock, and deepens the gloom of the living friends of the departed.

" I met him in the trial of this case and in its preparation for this Court, and, while he may not have tried as many causes as some other lawyers have, he had learned what some, unfortunately, never do, and that is to try a case upon its merits. He asked no small advantage; he was ready to have the issue thoroughly tried, and wanted no more.

" It is safe to say that in his death our profession in the State has met with an irreparable loss."