## LEATHERS v. CANFIELD.

BROKERS—COMMISSIONS.

117  277
120  413
117    277
142    63n

    A broker whose services in negotiations leading up to a sale of timber are solely in the interest of the buyer, and against the interest of the seller, cannot recover a commission from the latter.

Error to Kent; Grove, J. Submitted April 22, 1898. Decided June 7, 1898.

*Assumpsit* by Don J. Leathers against John Canfield for commissions on a sale of timber land. From a judgment for plaintiff, defendant brings error. Reversed.

*Butterfield & Keeney* (*Hanchett & Hanchett*, of counsel), for appellant.

*McGarry & Nichols* and *Judkins & Perkins*, for appellee.

LONG, J. This action is brought to recover a commission of $30,000, which plaintiff claims was agreed to be paid to him by defendant for plaintiff's services as a broker in procuring the purchase by the Thayer Lumber Company from defendant of 10,000 acres of pine land situated in Missaukee and Kalkaska counties. Plaintiff's claim is that in June, 1895, he met Mr. Munroe, superintendent of the Thayer Lumber Company, at Muskegon, and arranged with him to open negotiations with defendant for the purchase of this tract of timber, and in pursuance of which certain correspondence was had with defendant. Defendant would not consent to put these lands into the market, and refused to give an option thereon, but stated in a letter of November 6, 1895, that he would not refuse an offer of $1,500,000. On November 14, 1895, plaintiff called on defendant at his place of business, and as to that interview testified:

"Mr. Canfield said (in speaking of this timber) that he had always intended it should be manufactured at Manistee, and he would prefer to sell it for less money to come to Manistee than to go to Muskegon, or anywhere else. I told him the price which he had always held it at was altogether too high, and these folks would be glad to look at it at a price they thought they could afford to buy it. Mr. Canfield said to me that he had been offered $1,200,000 or $1,225,000,— I am not positive which. I asked him if he would give me an option on it for 30 days at $1,350,000 for the Thayer Lumber Company to look it, or rather for my parties to look it; I guess I did not tell him the Thayer Lumber Company then. He said not; he would not give me an option in writing, but would withhold it from market for 30 days' time in which the parties could have to go on and estimate it."

The plaintiff further testified:

"I asked him about commissions in case I found a purchaser for it,— in case my parties should take it after looking it. He said he had expected to pay a good commission to any one in case it was sold. I asked him what he called a good commission, and he said he thought $25,000 was a good, fair commission. I told him it was not enough for a deal of that kind at any such price. He said we would wait until they got through looking it to see whether they wanted it or not, and then we probably would have no trouble in agreeing upon a commission."

Plaintiff testified that he had another interview with defendant on December 3d, in which he told defendant that his offer of $25,000 commission was not enough, and that he ought to have a commission of $32,500. He says in this interview he told defendant, "I was getting a small commission from the other side."

The Thayer Lumber Company completed the examination of the land, and on December 13th Mr. Munroe went with plaintiff to Manistee to see defendant. No arrangement was made in regard to the purchase, and the parties separated. Plaintiff says that on that day, after Mr. Munroe had gone, he again told defendant that he was getting a small commission from the other parties,—from Mr. Munroe. About the 3d of January following this

last interview, the defendant was in Grand Rapids, and plaintiff sent for Mr. Munroe to meet him. Before Mr. Munroe came, plaintiff says he had a further talk with defendant about commissions, in which it was agreed between them that he should receive $30,000. At this meeting no arrangement was made for the sale of the land, as the parties could not agree upon the price.

It appears that before the time plaintiff met defendant at Manistee, and at which time he claims to have told defendant he was getting a small commission from Mr. Munroe, he had arranged with Munroe for a commission of $10,000. This agreement Munroe put in writing on December 11, 1895, as follows:

" *Dear Sir :* Confirming our verbal agreement of on or about the 22d ultimo, and our further conversation at Grand Rapids today, as requested by you, I write to say that if you negotiate with John Canfield the purchase by this company of the Canfield pine lands, so called, in Missaukee and Kalkaska counties, amounting to about 10,000 acres, we are to pay you $10,000, which will be in full of your commission and services and expenses in the matter. Otherwise we are under no obligations to you on account of any services you may have rendered or expenses incurred; it being the understanding that, if we so purchase, we are to get the property for the amount actually going to Mr. Canfield for the same."

In reference to this agreement plaintiff testified:

" At the time Mr. Munroe said he would give me $10,-000 if I would use my influence to get the timber for them at a price they could afford to buy it at, I said to him that I would do what I could, but I did not want that to bar me from any commission from Mr. Canfield; that it would be no price as a commission for a deal of that size, —of that magnitude. He said he did not care anything about how much commission I got from Mr. Canfield as long as he got the timber for the actual price going to Mr. Canfield."

It appears that after this meeting of the parties in Grand Rapids on January 3, 1896, no further negotiations were had between the parties in reference to purchase and

sale of the lands until in December following, when negotiations were opened between defendant and Mr. Munroe, and the lands were purchased from defendant by the Thayer Lumber Company for $1,200,000 some time in January, 1897, the contract being finally made, and first money paid, in February following. Mr. Munroe testified:

"During the fall of 1895 and up to January 3, 1896, when they [ the negotiations ] terminated, Mr. Leathers was acting in my behalf and in my interest. I had an arrangement with him, in case he got a satisfactory price for the timber, and negotiated the trade, we were to pay him a certain sum of money. Before we sent our man onto the lands, I saw Mr. Leathers, and asked him, 'What do you want out of this?' * * * and he said in a trade of that kind he ought to have $25,000 from us. I told him if that was his bottom figure we would go no further. * * * He said he could do us a lot of good in a trade of that kind, and wanted to work for our interest alone. * * * We finally agreed that if Mr. Leathers would work solely for our interest, and for no commission from the other side, and we were to have the timber for the net amount that Mr. Canfield sold it for, we would pay him $10,000 in cash, in case he negotiated the sale at a price satisfactory to us. * * * In doing what he did during the fall of 1895, I understood he was acting for me."

The defendant testified that he made no agreement with Mr. Leathers to pay him a commission, but, on the contrary, stated to him that he would not pay him any commission. He further testified that Mr. Leathers wanted a commission of $40,000, and that he told him he would have nothing to do with the deal, as he was able to make his own sales and handle his own lands as well as any one could do it for him.

The defendant's claims on the trial were: (1) That he did not employ plaintiff; and (2) that plaintiff was in the employ of the Thayer Lumber Company, and working for and in its interests, and not in the interest of defendant.

Plaintiff's claim was that he stood in relation to the

parties as a broker, acting for both. The court charged the jury upon that question as follows:

"Upon the question of double commissions,—whether a broker may act for both parties to a deal, whether he may be agent for both buyer and seller,—I understand the law to be that the broker cannot act as the agent of both parties where their interests are adverse, without their knowledge and consent. Where the double agency is unknown to either party, the broker cannot recover from both; that is, he cannot enforce the payment of commissions from the party who was ignorant of his being employed by the other,—who was ignorant of the double employment. Where the double agency is known and assented to by both parties, and each agrees to pay the broker a commission, he may recover from both; and where the broker is simply acting as a middleman to bring the parties together, and takes no part whatever in the negotiations between them, he may, to this extent, act as the agent of both parties, and recover commissions from each; and it is immaterial in such case that either party was unaware that he was employed by the other. It is claimed by the plaintiff in this case that that was his relation to this deal, —that he was simply a middleman to bring the parties together, they to make their own contract as to price and terms; while on the part of the defendant it is claimed that he was at least employed to serve the Thayer Lumber Company to a greater extent; that he was to do something more, as it is claimed by the defendant, in behalf of the Thayer Lumber Company; that he was to do everything he could to obtain a purchase for them on as reasonable terms as he could. There is a question of fact over which there is a controversy, and that is for you to determine which is correct."

The defendant asked the court to charge the jury as follows:

"It appears by the evidence of the plaintiff that, after the time when he claims the agreement was made between him and Mr. Canfield by which he was to be paid a commission by Mr. Canfield, he worked and acted in the business relating to the sale of the lands to the Thayer Lumber Company against Mr. Canfield's interest, and in the interest of the Thayer Lumber Company. Under the facts as related by the plaintiff, he is not entitled to recover."

This was refused. This request was based upon the testimony given upon the cross-examination of the plaintiff, and upon certain letters written by him to Mr. Munroe. On December 4, 1895, during the time the negotiations were going forward, plaintiff wrote Mr. Munroe:

"I went to Manistee yesterday. * * * I saw Mr. Canfield while there, and told him your men were now looking the land, and that you expected a report from them about the 10th. The 30 days will be up the 14th. Canfield expects to go away about the 18th. I could find out but little from him, further than that there are several parties now figuring on the timber. Dempsey is without doubt the most dangerous competitor, as he wants the timber. Chick found out from Antisdel yesterday that he expected to make a deal with Dempsey, and claims he has a sure thing of a sale; but all we can judge from what he says is, we know he is working hard to sell to Dempsey. I am satisfied that whatever you do about making the deal will have to be done by the 14th, and it seems to me it would be well to have a thorough understanding with your folks down East, so as to save any delay, as I believe Dempsey wants this timber. Antisdel told Chick that Dempsey had raised his bid to $1,200,000."

Again, on January 4, 1896, he wrote Munroe:

"Mr. Canfield left for Manistee at 4 o'clock. I had several talks with him yesterday and today, and have tried hard to impress upon him that you would buy if the price was reduced to where it should be."

On January 6th plaintiff wrote Mr. Munroe again, saying:

"I started in to help you get this tract of timber, and no one else, and I don't want you to think that I shall do anything nor say one word to any one until you decide to drop it, if you do so decide; and I am ready to assist in the matter *in your interest, the same as I have thus far.*
"P. S. You need have no fears of Mr. Canfield or any one else knowing through me that you have been East."

On November 20, 1895, he also wrote Mr. Munroe:

"I saw Canfield here today, and had quite a talk with

him.   He talks about the same as last week.   Says he will wait 30 days from the 14th inst.   But I am satisfied from what he says that Dempsey is quite strongly of the notion of buying the tract.   This, added to what I heard while at Manistee last week, which I told you about, leads me to believe that there is something in it more than simply talk.   I saw O'Brien today, and cautioned him against any favorable talks to Canfield about extending the railroad, and he will be all right.   He told me that he talked with Hughart before he went away, and that they had agreed that the rate should simply be enough to cover the cost of construction and hauling.   I believe, in order to save time, it is safe for you now to put your men on at once, and look the timber."

In reference to the building of the Grand Rapids & Indiana Railroad, spoken of in the above letter, the plaintiff testified:

"This tract of land was 23 miles north and east of the Grand Rapids & Indiana Railroad.   *   *   *   Mr. Munroe and I talked about the timber being brought over the Grand Rapids & Indiana Railroad, and Mr. Canfield talked about it with me in his office.   *   *   *   Mr. Canfield talked about the building of his road from Luther to Manistee, and, if the Grand Rapids & Indiana could be got to extend their road into the timber, it would be brought out that way, and he could take it to Manistee."

Plaintiff further testified as follows:

"*Q.* You say, in the talk of November 14th with Mr. Canfield, it was discussed that, by the extension of the Grand Rapids & Indiana Railroad up into the timber, the timber could be brought down into Manistee.   Did you do anything for Mr. Canfield to aid in the extension of that road to the timber?

"*A.* No, sir; I do not know that I did.

"*Q.* Did you not do something to prevent his obtaining the extension of the road into the timber?

"*A.* I had a talk with Mr. Hughart and Mr. O'Brien.

"*Q.* You had a talk with them for the purpose of preventing the extension, did you not?

"*A.* I had a talk with them for the purpose of arranging for the extension in there, at Mr. Munroe's request.

"*Q.* Did you not talk with them to dissuade them or

prevent them from making an extension of the road that would accommodate Mr. Canfield?

"*A.* I don't know whether I did or not. I think perhaps maybe I may have said to them that Mr. Munroe did not want it known.

"*Q.* Then you may have done what you could to prevent the Grand Rapids & Indiana Railroad Company from complying with any request that Mr. Canfield might make for the extension of the road to the timber?

"*A.* I don't know whether I did or not, sir."

On redirect examination plaintiff testified in reference to this matter:

"*Q.* Counsel has called your attention to an arrangement with the Grand Rapids & Indiana Company, with Messrs. Hughart and O'Brien, with reference to the extension of the Grand Rapids & Indiana road to this timber. What did you do in reference to this matter?

"*A.* I saw Mr. Hughart and Mr. O'Brien, to see if the road could be extended to the timber from Lake City for handling this tract of timber,—for bringing it out by rail to Muskegon, or to Big Rapids, rather.

"*Q.* Did you do anything or say anything to prevent him—Mr. Canfield—having the line extended there than you have already stated?

"*A.* No, sir; I did not. Both Mr. Hughart and Mr. O'Brien said that Mr. Canfield had talked with them about extending the line in, but the road was too poor financially to extend it, and, if it was extended for bring ing out that timber, somebody would have to put up the money; and thereby Mr. Munroe, for his company, arranged with the Grand Rapids & Indiana road to advance certain moneys to extend the line into the timber, and that money was to come back in freights. My recollection is, it was somewhere from $50,000 to $75,000 money that was to be advanced."

On cross-examination plaintiff was asked further as to what he did for Mr. Canfield:

"*Q.* I say, when you went to Mr. Canfield, before he agreed to pay you a commission, you were in a position where it was your duty to bring about a deal, if you could, without any commission from him?

"*A.* Well, sir, I was satisfied from the talk with Mr. Canfield that I would have a commission from him when I made the arrangement with Mr. Munroe. * * *

" *Q.* After making the agreement with Mr. Canfield, did you do anything to bring Mr. Munroe up in his price that you would not have done if you had had no agreement with Mr. Canfield?

"*A.* No, sir; I don't know that I did."

Plaintiff further testified:

" *Q.* While acting for the Thayer Lumber Company, you wanted to bring Mr. Canfield down in his price?

"*A.* I wanted to bring Mr. Canfield down where a deal could be made. I had talked with Mr. Canfield.

" *Q.* And, acting for Mr. Canfield, you wanted to bring the Thayer Lumber Company up in price?

"*A.* Yes, perhaps so.

" *Q.* So that you were playing each against the other in that way, were you not?

"*A.* Yes, sir."

It is settled in this State that a broker who simply brings the parties together, and has no hand in the negotiations between them, they making their own bargain without his aid or interference, can legally receive compensation from both of them, although each be ignorant of his employment by the other. *Ranney* v. *Donovan*, 78 Mich. 318; *Montross* v. *Eddy*, 94 Mich. 101 (34 Am. St. Rep. 323). But from the plaintiff's own testimony that is not the situation here. He first entered the employment of the Thayer Lumber Company, agreed upon a commission to come from that company, and agreed to act in its interest, and did so act during the whole time the negotiations were pending. The parties were not left to make their own bargain without his aid or interference. He was, under the agreement with the Thayer Lumber Company, to negotiate the purchase for it, and testified that during the negotiations he was trying to get Mr. Canfield's price down; and it is apparent from his letters to Mr. Munroe and from his testimony that in the interest of the Thayer Lumber Company he was active in measures to ward off Mr. Canfield from obtaining an extension of the Grand Rapids & Indiana Railroad to the timber, and in his dealings with Mr. Dempsey. The general rule

of agency is that an agent to buy or sell is bound to make the best bargain he can for his principal, and, if he takes any compensation from the other party, it becomes at once the property of his principal, the law not permitting the agent to allege that it was received otherwise than as agent. And generally no agent, in the course of his agency,—in the matter of his agency,—can be allowed to make any profit without the knowledge and consent of his principal. It is said in *Rice* v. *Davis*, 136 Pa. St. 442 (20 Am. St. Rep. 931), that—

"The principle underlying this case, that an agent for the sale of property cannot at the same time act as agent for the purchase thereof, or interest himself therein, and thus entitle himself to compensation from both vendor and vendee, is grounded on the infallible declaration that 'no man can serve two masters.'"

The evidence is undisputed and conclusive that the employment of plaintiff by the Thayer Lumber Company was not that of a middleman, and that he did not act as a middleman simply, but was employed to negotiate, and did negotiate, in the interest of that company, even as late as January 6, 1896. In his letter to Mr. Munroe he says: "I started in to help you get this tract of timber, and no one else. * * * I am ready to assist in the matter *in your interest, the same as I have thus far.*" The testimony of Mr. Munroe, which is undisputed, is: "We were to pay him a commission of $10,000 in cash in case he negotiated the sale at a price satisfactory to us;" and the written contract made with Munroe provided: "It being the understanding that, if we so purchase, we are to get the property for the amount actually going to Mr. Canfield for the same." It cannot be said, under these circumstances, that the plaintiff was a mere middleman.

In the case of *Everhart* v. *Searle*, 71 Pa. St. 261, it was said:

"An agent to sell cannot become an agent to buy. * * * 'The ground on which this disqualification rests,' it was said in 8 Tomlins' Brown, 72, 'is, * * *

that he that is intrusted with the interests of others cannot be allowed to make the business an object of interest to himself, because, from a frailty of nature, one who has the power will be too readily seized with the inclination to use the opportunity for serving his own interest at the expense of those for whom he is intrusted. The danger of temptation from the facility and advantage for doing wrong which a particular situation affords does, out of the mere necessity, work a disqualification.'"

We have seen from the letter of plaintiff of January 4, 1896, to Munroe, that he had "tried hard to impress upon him [ Canfield ] that you [ Munroe ] would buy if the price was reduced to where it should be." Certainly this was not the act of a disinterested middleman. It was the effort of the agent of the Thayer Lumber Company to get the defendant to state a lower price. It was in keeping with his conduct during the entire negotiations. He was working in the interest of the Thayer Lumber Company.

The request to charge should have been given. In this view of the case, no other questions need be discussed.

The judgment must be reversed, and a new trial ordered.

The other Justices concurred.