BROWN v. HURT.

BROKERS—FIDUCIARY RELATIONS—FRAUD—FORFEITURE.

    Where a broker has been accustomed to invest money for
       certain persons and to give them advice in real estate
       matters and they only contract to purchase land from
       other persons on the broker's assurance that the invest-
       ment will be profitable and that he will handle the land,
       which is to be improved, divided into lots and sold for a
       share in the profits, fiduciary relations exist between the

parties, and any right of recovery of compensation for platting and improving the property and endeavoring to market the same upon the ground that the broker was prevented from performing the contract by the opposition of the purchasers is barred by the concealment of the receipt of a commission from the vendor for the sale of the property.[1] OSTRANDER, J., dissenting.

Error to Kent; Perkins, J. Submitted June 27, 1917. (Docket No. 60.) Decided September 27, 1917.

Assumpsit by Chauncey M. Brown against Frank J. Hurt and another for services rendered. Judgment for defendants on a directed verdict. Plaintiff brings error. Affirmed.

*Smedley & Linsey,* for appellant.

*Clark H. Gleason (Ellis & Ellis,* of counsel), for appellees.

Plaintiff, a real estate dealer, on January 28, 1913, secured the agency for the sale of 31½ acres of land at $250 per acre from Warren Corkins and wife, who executed the following authority:

"C. M. BROWN & CO.:
"Please book for sale the following property: 31½ acres Sec. 10, Wyoming township.
"Price $7,875.00. Terms ½ cash, for which I agree to pay a commission of $25.00 per acre, if a sale is effected while your agency continues, or is barred by defect in title or my acts. Your agency to terminate February 11th, 1913.
　　　　　　　　　　"WARREN CORKINS.
　　　　　　　　　　"MRS. LAURA CORKINS."

Shortly thereafter he brought this property to the attention of defendants, with the result that the defendants purchased the property from Mr. and Mrs.

---

[1]On the question of fraud and secret dealings of real estate broker as affecting compensation, see comprehensive note in 45 L. R. A. 33; 24 L. R. A. (N. S.) 659; 34 L. R. A. (N. S.) 1047.

Corkins upon land contract on or about February 4, 1913. Upon the same date defendants entered into a contract with plaintiff in the following terms:

"This agreement made and entered into this 4th day of February, A. D. 1913, by and between Frank J. Hurt and Caroline Hurt, his wife, parties of the first part, and C. M. Brown, party of the second part, all of the city of Grand Rapids, county of Kent, and State of Michigan, witnesseth:

"1st. Said first parties hereby agree to purchase 31 acres of land on section ten (10) Wyoming township, on the terms and conditions of a certain land contract this day executed by Warren Corkins and Laura Corkins, his wife, to said first parties.

"2d. Said first parties hereby agree to pay bills for the improvement of said land, such as platting of the same into lots, grading of streets, laying of sidewalks, drainage, and advertising, as may from time to time be presented to them, when O. K.'ed by said second party, to the amount of not less than two thousand ($2,000) dollars, or more, at the discretion of the said first parties.

"3d. Said first parties hereby agree to sign all contracts or deeds presented to them by said second party for sale of lots and said land, providing, however, such sale shall be for an amount and on terms satisfactory to said first parties.

"4th. Said first parties further agree that after they have received in full the amount of money invested in purchase price, improvements, drainage, advertising, or for any moneys expended for the improvements of said land, together with interest on the same in full, at the rate of six per cent. per annum, then, that is to say, after the payment of all said above sums, said first parties shall contract or deed, as may be, an undivided half (½) interest in whatever lands there may be left, together with half (½) interest in all moneys due said first parties in consequence of unpaid amounts due or to become due for lands sold from said above description as payment in full for all services rendered.

"5th. Said second party hereby agrees to contract for, oversee, and look after the platting, laying of

streets, sidewalks, drainage, and all other improvements that may be necessary or may be required of said first parties in order to prepare the land in the best possible shape for quick sale and to render bills for all such work to said first parties for their approval and payment.

"6th. Said second party further agrees to put forth his very best efforts in the sale of said lots, to use every honorable means to dispose of and make the most possible money from said land, and to turn over to said first parties all moneys received by him in any way through the sale of said lands, and to accept in full for all services, an undivided half ($\frac{1}{2}$) of the net profits from the sale of said land after all the purchase price, moneys expended for improvements, and all interests at the rate of six per cent. per annum on all moneys invested, have been paid in full to said first parties.

"In witness whereof, we have this day first above written, set our hands and seals.

"FRANK J. HURT.    [Seal.]
"CAROLINE HURT.    [Seal.]
"C. M. BROWN.    [Seal.]"

The record shows clearly that defendants refused to entertain the proposition unless plaintiff would handle the property for them. Touching the sale to defendants plaintiff testified:

"I first learned the Corkins had this land for sale through Mr. Wolford. They were tendering him a contract for $225 an acre I think. Dr. Wolford came to me to go out and see the land. I went out there with him in an automobile, and looked the property over. It was perhaps two weeks after that I saw Mr. and Mrs. Hurt. I found out the doctor was not going to take it by talking with him. Before that time I had been handling money for Mr. and Mrs. Hurt. I couldn't tell exactly how long; probably three or four years. I don't know I had any way of knowing they had money they could invest, except what I learned by loaning for them.

"Q. How did you come to go and see the Hurts about buying this property?

"A. I went to see them, as I naturally would any-

body that I thought might be interested in making an investment. They had already been to me, and talking about investment; I had been with them to see some properties that they were talking of investing in. I went for one place in particular to see the Keeley Institute on College avenue and looked it over with them.

"*Q.* When they came to you, they came to you to advise them at that time?

"*A.* I think so.

"*Q.* Owing to the confidential relations that existed at that time between the Hurts and yourself?

"*A.* Yes, sir. I can't tell which I saw first Mr. or Mrs. Hurt. I presume likely I went to their house. I don't know whether I went to their house, or whether one of them might have been in the office when I first mentioned it to them. I saw them either at the office or at the house, and asked them if they would not consider buying such a piece of property as that; and, after talking it over with them, telling them exactly what it was, they said they would go down with me and look at it, which they did. I simply told them that there was 31 acres down there that could be bought for $250 an acre, and that I thought it was reasonable, and that I thought it could be platted and some money made off from it.

"*Q.* Did you tell them in your conversation with them that Dr. Wolford had just turned it down at $225 an acre?

"*A.* I did not; no, sir.

"*Q.* Did you tell them that you had a contract to sell it, and that if you sold it you would get $25 an acre for selling it?

"*A.* I did not; no, sir.

"*Q.* Did you tell them you had an option on it?

"*A.* I told them that I had a contract on it for to sell it, if I could sell it within two weeks, for so much money.

"*Q.* You had an option on it if you could sell it within that time?

"*A.* Yes.

"*Q.* And told them that the option you had was $7,500?

"*A.* Yes, sir; $7,750.

"*Q.* $7,750?

"*A.* Yes, sir. I took them down to see it—I think both of them. I don't just remember the weather at that time; there might have been a very little snow on the ground. There was not very much, if any; I don't remember about it. I told them I considered it cheap at $250 an acre. I made this contract for the Corkins and I made my contract. These contracts are both made and dated the same day, but the agreements were not made on the same day.

"*Q.* Did they ever agree to take that place at all until you agreed what you would do with it if they would take it?

"*A.* Yes, sir; they agreed to take the place, but they wanted me to handle it.

"*Q.* That was one of the conditions you held out to them that you could sell it and make a large amount of money for both of you, didn't you, to get them to buy that place?

"*A.* I held out that I thought it could be sold for a good, big profit; yes, sir, I think so yet.

"*Q.* Why didn't you tell them that you were interested to the extent of $25 an acre in the sale of it?

"*A.* When I go to sell a man a piece of property, I don't tell him that I am going to get a commission on it, the first thing I tell him. That would be a very poor business."

In accordance with the terms of the contract between plaintiff and defendants, plaintiff undertook to and did plat and improve said property and endeavored to sell the same. In this respect plaintiff was unsuccessful, although he handled the property for something like 1½ years. At the time of the trial in the court below the learned circuit judge found that defendants had expended in buying and improving said property the sum of $13,740, and had received from the sale of the lots and the sale of gravel found upon some of the lots, $1,553, leaving a net investment on the part of defendants of $12,187. Most of the lots sold by the plaintiff upon land contract were abandoned by the purchasers. In the spring or summer of 1914 a difference arose between plaintiff and

defendants with reference to the sale of the gravel from the subdivision, defendants apparently objecting thereto upon the ground that such sale would militate against the sale of the balance of the subdivision for residence purposes.

It is plaintiff's claim that he was prevented from performing his contract according to its terms by the unreasonable opposition of the defendants, whereas defendants claim that at all times they have been anxious to have plaintiff sell the lots, and have even advised him of their willingness to accept a loss if he could dispose of the property. About a year later plaintiff started this suit, in which he seeks to recover, not his share of the profits of the transaction under the contract, because it is obvious there are no profits, but compensation at $20 per day for 281 days' time which he alleges he spent in and about the platting and improving of the property and endeavoring to market the same. To this declaration defendants filed a plea of the general issue, with a notice thereunder to the effect that they had been induced to enter into the contract through the false and fraudulent representations of the plaintiff; that he had utterly failed to perform his part of the agreement by reason of which defendants had sustained damages to a large amount, which they asked to have certified in their favor.

Upon the trial the learned circuit judge directed a verdict in favor of the defendants upon the ground that plaintiff sustained toward defendants in the transaction a trust relation or agency which required him to exercise in his dealings with the defendants the fullest fairness and frankness; that plaintiff's concealment of the fact that he received $775 of defendants' money as a commission for the sale of the lands was essentially fraudulent, and would operate to prevent recovery, citing the case of *Friar* v. *Smith*, 120 Mich.

411 (79 N. W. 633, 46 L. R. A. 229). From judgment entered in accordance with said direction plaintiff appeals; the only error assigned or argued being that the court erred in directing a verdict in behalf of defendants and refusing to allow the case to go to a jury.

BROOKE, J. (*after stating the facts*). We are of opinion that the learned trial judge made a proper disposition of this case. The record quite clearly demonstrates that the defendants were people of modest means and limited experience in business affairs. The husband had for many years worked as a wood carver in one of the Grand Rapids furniture factories, and had through economy accumulated a small amount of money, which he from time to time invested through the agency of the plaintiff. Plaintiff himself testified that defendants came to him for advice because of the confidential relations that existed between them and him. It is further clear that defendants' original determination not to undertake the investment was changed only upon the assurance of the plaintiff that he would become jointly interested with them in the profits of the transaction, which he told them would be large, and which they understood would be realized only upon his participation in the deal. Although the contract between defendants and Corkins (husband and wife) was dated the same day as the contract between plaintiff and defendants, the latter was executed first. It is clear that defendants regarded both contracts as part of the same transaction in which plaintiff was jointly interested with them. There can be no doubt that through the entire transaction involving the purchase of the land by the defendants the plaintiff acted as their agent, that he sustained toward them a fiduciary relationship, and thus became charged with the duty to deal fairly with them. This he concededly did not do. In the case of *Barrett* v. *Miller*, 144 Mich. 454 (108 N. W. 396), this court said:

"Whether complainant be treated as an associate with defendants in the purchase of lands or a broker to invest their money, his relations were, in either case, fiduciary in character, requiring him to deal openly and truthfully with defendants."

See, also, *Leathers* v. *Canfield*, 117 Mich. 277 (75 N. W. 612, 45 L. R. A. 33) ; *Friar* v. *Smith*, 120 Mich. 411 (79 N. W. 633, 46 L. R. A. 229) ; *Woods* v. *Palmer*, 151 Mich. 30 (115 N. W. 242) ; *McNair* v. *Parr*, 177 Mich. 334 (143 N. W. 42) ; *Kirby-Sorge-Felske Co.* v. *Doty*, 190 Mich. 553 (157 N. W. 273).

The judgment is affirmed.

KUHN, C. J., and STONE, BIRD, MOORE, STEERE, and FELLOWS, JJ., concurred with BROOKE, J.

OSTRANDER, J. (*dissenting*). It is not improbable, but it is not certain, that the jury would have reached a conclusion upon the facts very much like the one declared by the court. I do not find in the record, or briefs, any support for the statement that plaintiff *concedes* that he did not deal fairly with the defendants. I cannot escape the conclusion that a question of fact, and not of law, is involved, and that the plaintiff is entitled to the judgment of a jury.