McLENNAN v. COLE.

1. PRINCIPAL AND AGENT—LOYALTY OF AGENT REQUIRED.
    Loyalty to his trust is the first duty which an agent owes to his principal, and without it the perfect relation cannot exist.

2. BROKERS—COMMISSIONS—BAD FAITH OF BROKER BARS RIGHT TO RECOVER.
    In an action by a real estate broker for commission on the sale of defendant's farm, where plaintiff, who for two years had been acting as the agent of defendant for the sale of the farm on a five per cent. basis, secured from him the written agreement sued on to accept $25,000 net to him, on the representation by plaintiff that $25,000 or $26,000 was the most he could get, although he then had an offer of $30,000 one-half cash, or $32,000 one-quarter cash and later secured an offer of $35,000, his

On fraud and secret dealings of real estate brokers as affecting commissions, see note in 45 L. R. A. 33.

conduct in concealing the facts from defendant constituted breach of good faith barring his right to recover.

Appeal from Wayne; Richter (Theodore J.), J. Submitted January 17, 1923. (Docket No. 105.) Decided October 1, 1923.

Bill by James M. McLennan and another against William R. Cole to enforce a claim for commissions on the sale of real estate. From a decree for defendant, plaintiffs appeal. Affirmed.

*E. S. Clarkson*, for plaintiffs.

*F. E. Rankin* (*Bigelow & Rankin*, of counsel), for defendant.

Steere, J. This suit was begun in the name of plaintiff McLennan as assignee of Arthur F. Brookman, a real estate broker in Detroit, to enforce payment by defendant Cole of a claim against him for $10,000, less $250 already paid, as commission alleged to have been earned by Brookman as agent for Cole in the sale of his 140-acre farm located near Mt. Clemens, Michigan. McLennan did not appear at the hearing as a witness and Brookman's interest in the case being recognized he was impleaded as a plaintiff.

Defendant Cole was a farmer, 78 years old at the time of the hearing, in 1922, had lived near Mt. Clemens for 35 years and on the farm in question for 25 years. After the death of his wife, prior to 1917, he offered it for sale. Brookman, who testified that his specialty was acreage and farm lands, learned that it was for sale and in the spring of 1917 interviewed defendant on the subject. Their first two contemporaneous agreements of agency are dated September 4, 1917, being Exhibit A which gives Brookman exclusive authority until 10 days after notice of with-

drawal to sell defendant's farm for $225 per acre, one-third cash and balance as may be agreed, on a cash commission of 5 per cent., and Exhibit B which is a duplicate of A except the named price per acre is $200. Of these Cole testified:

"Mr. Brookman said he wanted two prices. Would fall back on one if he could not get the other."

Brookman's explanation is:

"I had interested other real estate men at $225 per acre, they in turn offering the farm at $250 per acre. Exhibits A and B were at $200 and $225, the former as between Mr. Cole and me and the latter a working agreement in case of trade and to confirm the quotation to the other real estate men."

Following this Brookman advertised the place and made efforts in other ways to find a purchaser without success until the latter part of August, 1919. In the meantime he had kept in touch with Cole by correspondence and otherwise. He states that "the year 1918 was quiet," but in 1919 he "made an extra effort and advertised more." Amongst his efforts was an interview with Cole in July, 1919, at which, as he relates, he told Cole "real estate was slow and the only prospect I had was trailing off. He offered to turn it over to me at $25,000 net." Cole denied having made such a proposal or any remembrance of Brookman going to see him in July; said $25,000 was never mentioned until September 3, 1919, when Brookman saw him and said that was all he could get, and did say "he might get $26,000," and on that occasion he signed Exhibit C, which is the basis of plaintiffs' claim and reads as follows:

"EXHIBIT C.
"Detroit, Mich., Sept. 3, 1919.
"I hereby give A. F. Brookman exclusive authority, until 30 days after written notice of withdrawal has been given, to sell my property, known as the W. R.

Cole Farm of 140 acres, more or less, situate in Harrison township, Macomb county, Mich., on the south side of the Clinton river 1½ miles east of the Mt. Clemens city hall, for the sum of twenty-five thousand ($25,000) dollars net to owner.

"Terms to be presumably $10,000 down and the balance ($15,000) by contract or mortgage,—3 to 5 years as may be agreed upon.

"It is understood that A. F. Brookman, in lieu of a commission, is to secure his compensation over and above the net amount named above, I to furnish a merchantable abstract brought down to date.

(Signed) "W. R. Cole,
(Signed) "A. F. Brookman.

"It is agreed we are to divide the down or earnest payment. The one-half to A. F. Brookman to be that much towards his commission when paid or else the one-half is to be retained by each if forfeited."

A short time before procuring Exhibit C from Cole, Brookman was put in touch, at the office of a real estate agent named Robinson, with two men from Sandusky named Osberg and Knopf who were looking for acreage. He showed them a blue print of a plat he had prepared of the Cole farm, for which he stated the price was $35,000. Negotiations followed in which they submitted to him the following offer (Ex. R):

"Wyandotte, Mich., Aug. 30, 1919.
"To Mr. A. F. Brookman,
    "Detroit, Mich.

"*Dear Sir:* We have looked at the 140 acres near Mt. Clemens, and are willing to make an offer of $30,000, and pay ½ cash, or will be willing to offer $32,000 and pay ¼ cash, and ¼ in one year, balance on terms to suit both parties.

"Knopf & Osberg.
"Per C. L. Osberg."

With this offer in his pocket Brookman went to Cole on September 3d and obtained Exhibit C from him. He testified that he then reported this offer to

Cole but did not show it to him, and told him they "were willing to offer so and so," but after their talking about a golf club which was considering the property at a price of $250 an acre which Brookman said was still alive and he expected would "come through," Cole advised against accepting their offer of a lower price.

Cole testified of this interview:

"He did not tell me at that time, September 3, 1919, or at any time prior to that, that he had an offer for that property at $30,000 at any terms whatever. He did not at the time I signed the paper, September 3, 1919, tell me he had an offer for the property of $32,000 on any terms whatever, anything prior to that —that he had an offer of $30,000 or $32,000. * * * When I signed that paper (Ex. C) I relied on his statement that $25,000 was the best price he could obtain. That was the first time he talked $25,000 to me. He did not tell me the party. Next time I saw Brookman was September 12,"—

After obtaining Exhibit C, Brookman declined Knopf & Osberg's offer of August 30th, telling them that he did not submit it to Cole as the latter had said to him, "What is the use of your accepting these propositions when you had the golf club, and think you can get $250 an acre." Further negotiations followed as to which Knopf testified that they asked more than once to be brought in touch with the owner of the property, to which Brookman objected, saying: "Mr. Cole was a cripple and an invalid, that he was grouchy, * * * he had known him for years and knew just how to handle him and if we went up there we more than likely would spoil the deal."

On September 12, 1919, Knopf & Osberg finally acceded to the price Brookman insisted upon and gave him a written proposition of that date for submission to Cole offering to pay him $35,000 for his farm (marked Exhibit E) with a preliminary agreement in

substantial duplicate of their offer, signed by them, for Cole's acceptance and signature (Exhibit E*a*). The terms of payment and conclusion of the latter, which Cole signed, are as follows:

"Detroit, Mich., Sept. 12, 1919.

"*Know All Men by These Presents,* * * * for the sum of thirty-five thousand ($35,000) dollars, payable as follows: ninety-five hundred ($9,500) dollars within ten (10) days after delivery of abstract of title brought down to date, five hundred ($500) dollars having been paid on this date, ten thousand ($10,000) dollars on or before one (1) year thereafter, and the remaining fifteen thousand ($15,000) dollars on or before five (5) years thereafter, with a satisfaction release clause. * * *

"As an evidence of good faith we hereby pay over to Mr. Cole (through A. F. Brookman) five hundred ($500) dollars and this amount will be forfeited, in case we default in the above agreement.

"E. G. KNOPF,
"C. L. OSBERG.

"Witnessed in presence of:
"J. ROBINSON,
"CHARLES R. WILLIAMS.

"Accepted: W. R. COLE.
"Witness: A. F. BROOKMAN, Agent."

He at the same time also presented a paper (Exhibit D) and obtained Cole's signature to it, which reads as follows:

"We to observe this in strict confidence between ourselves.

"515 Free Press Building,
"Detroit, Mich., Sept. 12/19.

"It is hereby agreed between the undersigned that in lieu of a commission to A. F. Brookman on the sale of the W. R. Cole farm of 140-acres more or less, and situated in Harrison twp., Macomb Co., Mich. That as the *down* and following pay'ts are made, W. R. Cole is to pay A. F. Brookman as Agt. one-half of each pay't when made up to ten thousand dollars, when said Brookman's interest ceases. This is to be

part of the agreement of sale of even date as to the undersigned.

(Signed) "W. R. Cole,
(Signed) "A. F. Brookman."

On the strength of this writing plaintiffs claim an interest in the land and filed a notice of *lis pendens* against it.

Of what passed between them Cole testified to being surprised at the purchase price stated in the papers and interrogating Brookman as to what the additional $10,000 meant, saying in part:

"*Q.* Who did he say it was to be divided with?

"*A.* These parties, Knopf & Osberg.

"*Q.* What did you rely upon in signing that paper?

"*A.* He said that he could not sell it without that $10,000 was added to it so that they could divide it up. They claimed that they were entitled to something for their expenses in coming to Detroit, and they wanted to get it as cheap as they could for the people they represented and they wanted to buy it with that large rake-off or they would not take it."

Brookman testified of that feature of their interview:

"I told Mr. Cole at the time Exhibits D and E*a* were signed there was to be a division. He said it made no difference to him as long as he got his $25,000 net."

During their negotiations the only concession made by Brookman to Knopf and Osberg from the full price he demanded of $35,000 was a reduction in or split with them of his 5 per cent. commission, as they understood it, on the purchase price, "in the event of a sale" to them at the price demanded, evidenced by a memorandum which he had signed.

In January, 1920, knowledge of matters in relation to this transaction had come to Knopf and Osberg through a suit brought against Brookman by a man named Forkel which led them to interview Cole, telling him they had heard he never asked over $225 an acre

for the place, while under Brookman's representations as to his demands they were paying $35,000, less one-quarter of his 5 per cent. commission. Cole expressed himself as surprised and would not discuss the matter with them in Brookman's absence, but waited to see them together and had them meet a short time later at his home in the presence of his daughter, where the matter was gone into with Brookman present and Cole accused Brookman of duplicity and false representations to both parties as to the price demanded, offered and to be paid, directly charging him with concealing the facts from and falsely representing to Cole that no more than $25,000 could be obtained for the property, both when he had received an offer of $32,000 and the actual price accepted by and to be received from the purchasers was $35,000, thus by false representations inducing him to sign Exhibits C, D, and E*a*, demanded his papers back and repudiated Brookman as his agent. The evidence shows a rather stormy interview in which Cole flatly accused Brookman of having pledged him to secrecy and then "lied about the whole case," which he claimed Brookman admitted and, as Mrs. Martin, the daughter, testified, apologized to Cole for so doing, but said of Knopf and Osberg "I owe them nothing. They got the farm and I don't consider it (the $10,000) their business." Brookman said of that feature of the interview:

"Mr. Cole told me I had not fairly stated the facts to him, but I don't remember the words. He didn't say I had been lying to him but intimated I had been unfaithful—there had been misrepresentation. I did not say I owed him an apology; I don't recollect those words, but I will not swear to it."

The trial court dismissed plaintiffs' bill and discharged the notice of *lis pendens*, saying in part:

"It appears to the court and the court finds that the

said Brookman at the time of securing the execution by the defendant of the agreements, Exhibit C and Exhibit D, failed to fully and fairly disclose to the defendant material facts with regard to negotiations with the said Knopf and Osberg as to the sale of the farm and the price to be obtained therefor; that he fraudulently concealed from the defendant Exhibit R. * * * It is plain that under the agreement, Exhibit B, if the proposition to pay $32,000 for the farm had been submitted by Brookman and it had been accepted by the defendant, the defendant would have received from the sale of the farm nearly $30,000 net to himself, and it would be unreasonable to believe that the defendant would, if the proposition had been made, have rejected it or would have executed the agreement, Exhibit C, stipulating that Brookman might sell the farm for $25,000 net to the defendant."

Plaintiffs' counsel says in his brief that this is not a case of secret profits, and—

—"the main question seems to be whether an agent in selling a piece of property and getting his commission over and above the amount going to his principal is in duty bound to tell his principal how he is dividing that commission even without asking."

In advancing that proposition as the main question in the case counsel evades the controlling issue by assumption of a valid contract between agent and principal that the agent's commission shall be the amount he may sell the property for in excess of a net price the principal agrees to accept for it. The real issue is whether the agreements to that effect which Brookman obtained from Cole were void, or voidable, because he secured them by fraudulent concealment and false representations in violation of the good faith and honesty which the fiduciary relations between agent and principal impose.

Brookman was at all times during these transactions acting as Cole's agent for sale of the property. He so names himself in Exhibit D. Fidelity and loyalty to

that trust was his duty.    That unquestioned rule of agency is text book authority.

"Loyalty to his Trust, the First Duty of the Agent. Loyalty to his trust is the first duty which the agent owes to his principal.    Without it, the perfect relation cannot exist.    Reliance upon the agent's integrity, fidelity and capacity is the moving consideration in the creation of all agencies; in some it is so much the inspiring spirit, that the law looks with jealous eyes upon the manner of their execution, and condemns, not only as invalid as to the principal, but as repugnant to the public policy, everything which tends to destroy that reliance."    1 Mechem on Agency (2d Ed.), § 1188.

The following are some of the cases in this State fairly in point touching the agent's first duty and required loyalty to his principal:  *Moore* v. *Mandelbaum*, 8 Mich. 433; *People* v. *Township Board of Overyssel*, 11 Mich. 222; *McNutt* v. *Dix*, 83 Mich. 328 (10 L. R. A. 660); *McDonald* v. *Maltz*, 94 Mich. 172 (34 Am. St. Rep. 331); *Phinney* v. *Hall*, 101 Mich. 451; *Barrett* v. *Miller*, 144 Mich. 454; *Hogle* v. *Meyering*, 161 Mich. 472; *Brown* v. *Hurt*, 198 Mich. 276.

Under the obligations of his agency it was Brookman's first duty to communicate to Cole any facts relating to the business of his agency which he should in good faith under their trust relations have made known to his principal.    *Michigan Crown Fender Co.* v. *Welch*, 211 Mich. 148 (13 A. L. R. 896).

This record conclusively shows that Brookman had been Cole's agent for the sale of this farm on a 5 per cent. commission for nearly 2 years, in confidential relations with and relied on by him, as Cole's testimony and correspondence between them shows, when, on August 30, 1919, he finally obtained an offer in writing (Ex. R) from Knopf and Osberg of $30,000, ½ down, or $32,000 ¼ down, for submission to Cole.

He was then asking them $35,000 as the least price his principal would accept.    After a Sunday and holiday had intervened he went to Cole, on September 3, 1919, did not disclose to him the two propositions which he as Cole's agent was in duty bound to do, in itself a breach of good faith, and representing to him that $25,000 or possibly $26,000 was the maximum price for which the property could be sold, he secured Cole's signature to the subsequent agreements relied on (Exs. C, D and E*a*), concealing from him the previous offers contained in Exhibit R.    Then, while insisting to the prospective purchasers that the price he first demanded was the lowest which could be obtained, he counseled against their meeting Cole as it might be detrimental to their negotiations because of his peculiarities.

The trial court rightly held that Brookman's fraudulent concealment and breach of good faith in dealing with his principal in regard to this transaction bars him and his nominal assignee from the relief sought.

The decree is affirmed, with costs.

WIEST, C. J., and FELLOWS, MCDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.